United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CARL W. JASPER,

            Plaintiff,

     v.

MAXIM INTEGRATED PRODUCTS, INC.,

            Defendant.

Case No. 15-CV-00481-LHK

**ORDER SUA SPONTE REMANDING CASE AND DENYING AS MOOT MOTION TO DISMISS**

Plaintiff Carl Jasper ("Plaintiff") brings an action for, inter alia, breach of contract against defendant Maxim Integrated Products, Inc. ("Maxim"), his former employer.  ECF No. 1 Ex. A ("Compl.").  Before the Court is Maxim's motion to dismiss.  ECF No. 7 ("Mot.").  Plaintiff has opposed the motion, ECF No. 17 ("Opp."), and Maxim has replied, ECF No. 19 ("Reply").

The Court finds this matter suitable for decision without oral argument under Civil Local Rule 7-1(b) and hereby VACATES the motion hearing and initial case management conference set for June 4, 2015, at 1:30 p.m.  Having considered the submissions of the parties, the relevant law, and the record in this case, the Court hereby ORDERS that this case be remanded to Santa Clara County Superior Court for lack of subject matter jurisdiction.  Accordingly, the Court DENIES as moot Maxim's motion to dismiss.

# I.    BACKGROUND

## A.  Factual Background

### 1.  The Parties

Maxim, a Delaware corporation with its principal place of business in San Jose, California, is a publicly traded semiconductor company listed on the NASDAQ stock exchange.  Compl. ¶ 2.  Plaintiff is Maxim's former chief financial officer ("CFO").  *Id.* ¶¶ 1, 5.  Maxim first hired Plaintiff in May 1998 as a corporate controller.  *Id.* ¶ 5.  Plaintiff was promoted to CFO in April 1999.  *Id.*  From 1999 until 2007, Plaintiff served as Maxim's principal accounting officer, CFO, and vice president, and he was responsible for Maxim's accounting, including the accuracy of the company's financial statements and internal controls.  *Id.* ¶¶ 6, 9.

### 2.  Backdating Stock Options

Beginning in April 2006, Maxim undertook an internal review to determine whether the company had improperly issued backdated stock options.  Compl. ¶ 8.  In ruling on Plaintiff's appeal from the ensuing Securities and Exchange Commission ("SEC") enforcement action prosecuted against him, the Ninth Circuit explained the practice of backdating stock options as follows:

> A stock option grants the recipient "the opportunity to purchase a certain number of shares of company stock at a given price [called the 'exercise price'] on or after a predetermined date." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1093 (9th Cir. 2011).  The recipient may exercise the option by purchasing stock from the company at the exercise price, and he is then free to sell the same stock at its current market price.  If the option is issued at an exercise price equal to the current market price, the option is referred to as having been issued "at the money."  Conversely, an "in the money" option is issued at an exercise price that is lower than the current market price.  This latter type of option is "in the money" because it is immediately profitable: the price at which the stock may be bought is lower than the price at which it may be sold.
>
> . . . .
>
> Backdating of options occurs when the company official responsible for administering a company's stock option plan monitors the price of the company stock and awards an "at the money" stock option grant as of a certain date in the past when the share price was lowest.  *Id.*  This "lock[s] in the largest possible gain for the option recipient" but also does not require the company to recognize as an

Case No. 15-CV-00481-LHK
ORDER SUA SPONTE REMANDING CASE AND DENYING AS MOOT MOTION TO DISMISS

expense the difference between the backdated exercise price and the market price of the stock as of the "legitimate" date of the option's award. *Id.* This practice is therefore "akin to betting on a horse race after the horse has already crossed the finish line." *Id.* Backdating options is "not in and of itself improper under the law or accounting principles," but it often leads to violations of the securities laws because "[i]f the company does not properly record the back-dated options, then the company's reported net income is overstated for each of the years the options vest, potentially deceiving the market and investors." *Id.*

*SEC v. Jasper*, 678 F.3d 1116, 1119-20 (9th Cir. 2012) (alterations in original).

After Maxim established a special committee to review all of the company's grants of employee options, it was discovered that Maxim had issued backdated stock options without properly expensing them. Compl. ¶ 8. Maxim, which is required to file with the SEC Form 10-Q quarterly reports and Form 10-K annual reports that must include audited financial statements, announced in September 2006 that it was unable to timely file these reports because of the backdating investigation. *Jasper*, 678 F.3d at 1120-21. Due to allegations that Plaintiff, as CFO, was involved in the improper backdating of stock options, Plaintiff resigned from Maxim effective January 31, 2007. Compl. ¶ 9. Plaintiff and Maxim entered into a written severance agreement and release dated February 2, 2007. *Id.* The Court discusses this agreement in detail below. *See infra* Part I.A.5.

### 3. SEC Enforcement Action

On December 4, 2007, the SEC filed a civil enforcement action against Plaintiff in the Northern District of California. *See SEC v. Jasper*, No. 07-06122. The SEC alleged that Plaintiff had "engaged in a scheme to illegally back-date stock options granted to Maxim employees and directors, concealing millions of dollars in expenses from investors and significantly overstating the Company's income." *Jasper*, 678 F.3d at 1119. At Plaintiff's jury trial in April 2010, the evidence showed that from 2000 through 2005, while Plaintiff was CFO, Maxim employees and officers regularly backdated stock options granted to employees and created false paperwork to conceal the true grant dates for those options. *Id.* at 1120. "[F]or ten consecutive quarters," the Ninth Circuit explained, "Maxim granted backdated options with an exercise price equal to the lowest price of Maxim stock for each quarter." *Id.* The testimony was that, during that time

1   period, "the way the company worked was to grant options at the lowest possible price without

2   taking expense for it." *Id.* (ellipsis omitted).  The testimony was also that "Maxim's operating

3   income for fiscal years 2003, 2004, and 2005 alone had been overstated by a minimum of $135

4   million and as much as $357 million due solely to failure to recognize the true expense of

5   unrecorded, backdated stock options." *Id.* at 1121.

6       Here, as before the Ninth Circuit, Plaintiff "does not dispute his knowledge of or

7   involvement in this fraudulent scheme." *Jasper*, 678 F.3d at 1121.  "Perhaps," said the Ninth

8   Circuit, "that is because the evidence is overwhelming." *Id.*  For instance, the evidence showed

9   "that in late February or early March of 2003, when Maxim stock was over $30 per share,

10  [Plaintiff] sent a memorandum to CEO [Jack] Gifford proposing that to 'ensur[e]' that a certain

11  employee 'stays with Maxim,' Gifford should 'grant [the employee] an option now at the Oct

12  price so that he gets a favorable price.'" *Id.* (third and fourth alterations in original).  That

13  employee ultimately "received an 'at the money' options grant backdated to October 9, 2002 with

14  an exercise price of $21.35." *Id.*  Due to "the roughly 50% increase in the company's stock price

15  between October 2002 and March 2003, the grant was immediately profitable for the employee,

16  and therefore truly a company expense for employee compensation, but the difference between

17  $21.35 and $30.00 per share was never recorded as a transfer of money otherwise readily available

18  to Maxim." *Id.*

19      Plaintiff, the Ninth Circuit explained, "signed all of Maxim's SEC filings in that time

20  period." *Jasper*, 678 F.3d at 1121.  By doing so, Plaintiff attested "that the filings all 'fairly

21  present in all material respects the financial condition, results of operations and cash flows of' the

22  company and 'do[] not contain any untrue statement[s] of a material fact or omit to state a material

23  fact necessary to make the statements made, in light of the circumstances under which such

24  statements were made, not misleading.'" *Id.* (alterations in original).  Notably, Plaintiff himself

25  "received more than $2 million in bonuses from 2000-2005 tied to the company's profitability,

26  including year-over-year growth in stock price and earnings per share." *Id.*

27      The jury found Plaintiff liable for several securities laws violations.  Specifically, the jury

28
Case No. 15-CV-00481-LHK
ORDER SUA SPONTE REMANDING CASE AND DENYING AS MOOT MOTION TO DISMISS

*United States District Court*
*Northern District of California*

found that Plaintiff had (1) committed fraud in violation of 15 U.S.C. §§ 77q(a)(1), 78j(b), and SEC Rule 10b-5, *codified at* 17 C.F.R. § 240.10b-5, when he participated in a scheme to overstate Maxim's net income by failing properly to account for the issuance of backdated stock options; (2) aided and abetted Maxim's filing of materially false and misleading reports with the SEC, in violation 15 U.S.C. § 78m(a); (3) aided and abetted Maxim's failure to keep accurate books and records, in violation of 15 U.S.C. § 78m(b)(2)(A); (4) aided and abetted Maxim's failure to devise and maintain sufficient internal accounting controls, in violation of 15 U.S.C. § 78m(b)(2)(B); (5) falsified Maxim's books and records, in violation of 17 C.F.R. § 240.13b2-1; (6) made false statements or omissions to an accountant or auditor in connection with a required audit of Maxim's financial statements, in violation of 17 C.F.R. § 240.13b2-2; and (7) signed false certifications included with Maxim's quarterly or annual reports, in violation of 17 C.F.R. § 240.13a-14.  *Jasper*, 678 F.3d at 1121-22.

As a result of the jury's findings, the district court barred Plaintiff from serving as an officer or director of a publicly traded company for two years, imposed a civil penalty of $360,000, and ordered, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002, *codified at* 15 U.S.C. § 7243, that Plaintiff reimburse Maxim for $1,869,639.00 in bonuses and profits from the sale of Maxim stock that Plaintiff had received during the period that he certified Maxim's false financial statements.  *Jasper*, 678 F.3d at 1122.  The district court also permanently enjoined Plaintiff from "violating Section 10(b) of the Securities Exchange Act of 1934" in the following ways:

> (1) employing any device, scheme, or artifice to defraud;
>
> (2) making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
>
> (3) engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of the securities of any issuer, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange.

5

1    *SEC v. Jasper*, No. C 07-06122 JW, 2010 WL 8898216, at *2 (N.D. Cal. Nov. 5, 2010).  The

2    district court's judgment was affirmed by the Ninth Circuit on May 15, 2012.  *Jasper*, 678 F.3d at

3    1131.

4              **4.   Derivative Action**

5              In addition to the SEC enforcement action, Plaintiff was involved in numerous other

6    lawsuits relating to Maxim's improper backdating of stock options.  *See* Ioannou Decl. Ex. F

7    (2010 SEC Form 10-K), ECF No. 8-3 at 13.  One of those lawsuits, *Ryan v. Gifford*, No. Civ

8    2213-N, was a derivative action brought ostensibly on behalf of Maxim in the Delaware Court of

9    Chancery.  *Id.*  On September 16, 2008, the parties in *Ryan* entered into a settlement agreement

10   requiring Plaintiff to surrender "97,363 vested, unexercised stock options that were granted to

11   [Plaintiff] on June 17, 1998."  Ioannou Decl. Ex. C, ECF No. 8-2, § 2.4(a).  That settlement was

12   approved on January 2, 2009.

13             **5.   Severance Agreement**

14             As indicated above, on February 2, 2007—two days after Plaintiff's resignation from

15   Maxim went into effect—the parties entered into a written severance agreement and release (the

16   "Agreement").  *See* Medlin Decl. Ex. 1, ECF No. 9.  The Agreement, which Plaintiff did not

17   attach to his complaint, provided that Maxim was to pay Plaintiff $482,400.00 "in full and final

18   settlement of all claims [Plaintiff] may otherwise make related to his employment with and

19   compensation from Maxim."  *Id.* ¶ 2.  "In consideration of the payment described in paragraph 2,"

20   the Agreement continued, Plaintiff "forever release[d] and discharge[d] Maxim" from any "causes

21   of action" and "claims" that may "arise[] out of or relate[] to [Plaintiff's] employment with

22   Maxim, including, but not limited to, any claims for payment of salary, benefits or wages,

23   retaliation, violation of public policy, breach of contract, breach of the covenant of good faith and

24   fair dealing, defamation . . . and any other federal, state or local statutes, which provide remedies

25   for unfair employment practices."  *Id.* ¶ 5.  "Notwithstanding the foregoing," however, "[Plaintiff]

26   does not release . . . Claims arising under this Agreement . . . [or] Claims to all benefit

27   entitlements vested as the date of termination of [Plaintiff's] employment, pursuant to the written

28

Case No. 15-CV-00481-LHK
ORDER SUA SPONTE REMANDING CASE AND DENYING AS MOOT MOTION TO DISMISS

United States District Court
Northern District of California

1    terms of any applicable Company employee benefit plan." *Id.* ¶ 5(a), (d).

2          The Agreement also indicated that "[Plaintiff] has been granted certain options to purchase

3    shares of Maxim's common stock (the 'Options'), as well as restricted stock units (the 'RSUs'),

4    which Options and RSUs are set forth in Exhibit A hereto." Medlin Decl. Ex. 1, ECF No. 9, ¶ 4.

5    Specifically, "[Plaintiff] shall be vested in that number of Options and RSUs set forth in the

6    column entitled 'Vested' next to each such Option (the 'Vested Options') and RSU (the 'Vested

7    RSUs')." *Id.*  Those vested options and RSUs were listed in an attachment to the Agreement and

8    included: 285,000 options granted on June 17, 1998; 16,238 options granted on March 1, 1999;

9    61,762 options also granted on March 1, 1999; 2,669 options granted on September 27, 2001;

10   37,031 options also granted on September 27, 2001; 60,000 options granted on April 26, 2002;

11   and 750 vested RSUs, which were automatically exercised and sold by Plaintiff on August 15,

12   2006. *Id.* at 10.  Plaintiff agreed "that the portion of each Option and each RSU that is unvested as

13   of the Separation Date is forfeited and shall cease to be exercisable as of the Separation Date." *Id.*

14   ¶ 4.

15          The remainder of paragraph 4 of the Agreement provided as follows:

16   [Plaintiff] may exercise the Vested Options and RSUs in accordance with their
     original terms of grant pursuant to the applicable stock option plan,[1] stock option
17   agreements, and RSU agreements.  Nothing in this settlement agreement shall
     prevent [Plaintiff] from hereafter exercising any right with respect to vested Maxim
18   stock options and Maxim common stock to be issued upon vesting and exercise of
     restricted stock units that arose prior to the date of this Agreement, but the exercise
19   and sale of which were prohibited by the terms of the "blackout"[2] instituted by
     Maxim commencing in September 2006 pursuant to the terms of that "blackout."
20   [Plaintiff's] rights with respect to such exercises and eventual sale shall be the same
     as those of all Maxim employees whose employment with Maxim terminated
21   during this blackout period, including the right to exercise such Options and RSUs
     by September 30, 2007 or by any other extension provided by Maxim or its Board
22   of Directors in the future to other Maxim employees or former Maxim employees.

23

24          [1] The parties agree that Maxim's 1996 amended stock incentive plan (the "Plan") is the
25   "applicable stock option plan" incorporated by reference in paragraph 4 of the Agreement.  *See*
     Mot. at 5 n.12; Opp. at 1 n.2.
26          [2] According to Plaintiff's complaint, the "blackout" refers to the "time period of two years
27   whereby MAXIM could not trade on the NASDAQ Stock Market from September 23, 2006 to
     approximately October 2, 2008."  Compl. ¶ 10.

28
Case No. 15-CV-00481-LHK
ORDER SUA SPONTE REMANDING CASE AND DENYING AS MOOT MOTION TO DISMISS

1  Medlin Decl. Ex. 1, ECF No. 9, ¶ 4.  Plaintiff alleges that other Maxim employees "were offered

2  several buy back or goodwill payments for options that were expiring during the 'blackout'

3  period."  Compl. ¶ 9.  Plaintiff, for his part, "was given no such offers."  *Id.*

4       Plaintiff also claims that he "attempted to exercise his options which were vested and

5  guaranteed in the above-referenced agreement."  Compl. ¶ 11.  On April 16, 2008, for example,

6  Plaintiff's attorney sent a letter to Maxim's general counsel (the "Letter") requesting "cash

7  payments" for Plaintiff's "285,000 unexercised Maxim options that are scheduled to expire on

8  June 17, 2008."  Medlin Decl. Ex. 3, ECF No. 9.[3]  Noting that Maxim had "implemented a policy

9  to provide" goodwill cash payments to other former employees, the Letter, citing Plaintiff's

10  "severance agreement" requiring that he "receive fair and equal treatment," stated that Plaintiff

11  was "entitled to cash payments for his expiring options under this policy."  *Id.*

12       Though, Plaintiff alleges, his "agents repeatedly requested that [Maxim] honor its contract

13  with [Plaintiff]," Compl. ¶ 16, Maxim has "refused to honor said agreement and allow [Plaintiff]

14  to exercise his options and cash out his vested options and vested restricted stock units," *id.* ¶ 11.

15  Plaintiff alleges further that Maxim, in denying his requests, has given Plaintiff "several

16  extensions of time to exercise the options" and "entered into specific tolling agreements with

17  [Plaintiff] for [Plaintiff] to exercise his options thereafter up to and including December 14, 2014."

18  *Id.* ¶ 11.

19  **B.  Procedural History**

20       On December 10, 2014, Plaintiff filed suit against Maxim in Santa Clara County Superior

21  Court.  *See* Compl.  In his complaint, Plaintiff asserts the following eight causes of action: (1)

22  breach of contract, *id.* ¶¶ 12-17; (2) breach of the covenant of good faith and fair dealing, *id.*

23  ¶¶ 18-21; (3) failure to pay wages, Cal. Lab. Code § 200 *et seq.*, *id.* ¶¶ 22-27; (4) conversion, *id.*

24  ¶¶ 28-35; (5) intentional misrepresentation, *id.* ¶¶ 36-44; (6) negligent misrepresentation, *id.*

25

26       [3] The options referenced in the Letter were granted to Plaintiff on June 17, 1998, *see*
27  Medlin Decl. Ex. 1, ECF No. 9 at 10, and, pursuant to the Plan, were set to expire ten years later
   on June 17, 2008, *see* Medlin Decl. Ex. 2, ECF No. 9, ¶ 6(d).

28
Case No. 15-CV-00481-LHK
ORDER SUA SPONTE REMANDING CASE AND DENYING AS MOOT MOTION TO DISMISS

¶¶ 45-49; (7) unfair business practices under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, *id.* ¶¶ 50-52; and (8) unjust enrichment, *id.* ¶¶ 53-54.

Maxim removed this case to federal court on February 2, 2015.[4]  ECF No. 1.  A week later, on February 9, 2015, Maxim filed the instant motion to dismiss, arguing that each of Plaintiff's eight causes of action should be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.  Mot. at 17.  That same day, Maxim filed an unopposed request for judicial notice.  ECF No. 10.  Following an extension granted by the Court, ECF No. 14, Plaintiff filed his opposition to Maxim's motion to dismiss on March 24, 2015, Opp. at 25.  Maxim replied on April 6, 2015.  Reply at 16.

## II.    LEGAL STANDARD

A suit may be removed from state court to federal court only if the federal court would have had subject matter jurisdiction over the case.  28 U.S.C. § 1441(a); *see Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant.").  "In civil cases, subject

---

[4] Maxim's notice of removal states that service of process on Maxim was completed on January 2, 2015.  ECF No. 1 at 7.  Maxim then writes: "Fewer than 30 days have elapsed prior to the filing of the notice of removal, in accordance with 28 U.S.C. § 1446(b)."  *Id.*  However, Maxim did not file its notice of removal until February 2, 2015—i.e., thirty-one days after service was completed.  Removal was therefore untimely.  *See* 28 U.S.C. § 1446(b) ("The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based . . . .").

That said, Plaintiff never filed a motion to remand based on this procedural defect, and the deadline for doing so has long since passed.  *See* 28 U.S.C. § 1447(c) ("A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal."); *see also Maniar v. FDIC*, 979 F.2d 782, 784-85 (9th Cir. 1992) (holding that "untimely removal is a procedural defect and not jurisdictional, and that § 1447(c) limits a district court's power to remand a case *sua sponte* for such a procedural defect").  Because the Court "may remand for defects other than lack of subject matter jurisdiction only upon a timely motion to remand," *Smith v. Mylan Inc.*, 761 F.3d 1042, 1044 (9th Cir. 2014), and Plaintiff has failed to file such a motion, Plaintiff has waived the right to challenge Maxim's removal as untimely, *see Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1212 (9th Cir. 1980) ("Although the [thirty-day] time limit is mandatory and a timely objection to a late petition will defeat removal, a party may waive the defect or be estopped from objecting to the untimeliness by sitting on his rights.").

Case No. 15-CV-00481-LHK
ORDER SUA SPONTE REMANDING CASE AND DENYING AS MOOT MOTION TO DISMISS

1  matter jurisdiction is generally conferred upon federal district courts either through diversity

2  jurisdiction, 28 U.S.C. § 1332, or federal question jurisdiction, 28 U.S.C. § 1331." *Peralta v.*

3  *Hispanic Bus., Inc.*, 419 F.3d 1064, 1068 (9th Cir. 2005).  If it appears at any time before final

4  judgment that the federal court lacks subject matter jurisdiction, the federal court must remand the

5  action to state court.  28 U.S.C. § 1447(c).

6        The party seeking removal bears the burden of establishing federal jurisdiction.  *Provincial*

7  *Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1087 (9th Cir. 2009).  "The removal

8  statute is strictly construed, and any doubt about the right of removal requires resolution in favor

9  of remand."  *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1244 (9th Cir. 2009) (citing

10  *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992)).

### III.     DISCUSSION

12        Federal courts "are obligated to consider sua sponte whether [they] have subject matter

13  jurisdiction."  *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1116 (9th Cir. 2004).  This "independent

14  obligation" exists "even if the issue is neglected by the parties."  *Allstate Ins. Co. v. Hughes*, 358

15  F.3d 1089, 1093 (9th Cir. 2004).  Even though Plaintiff has not filed a motion to remand or

16  otherwise opposed removal, the Court concludes, for the reasons stated below, that it lacks subject

17  matter jurisdiction over this action.  Accordingly, the Court must remand this action to Santa Clara

18  County Superior Court and deny as moot Maxim's motion to dismiss.

### A.     Subject Matter Jurisdiction

20        The federal removal statute is clear: "If at any time before final judgment it appears that

21  the district court lacks subject matter jurisdiction, the case *shall* be remanded."  28 U.S.C.

22  § 1447(c) (emphasis added).  "Absent diversity of citizenship," the U.S. Supreme Court has held,

23  "federal-question jurisdiction is required."  *Caterpillar*, 482 U.S. at 392.  Here, there is no

24  diversity of citizenship because Plaintiff and Maxim are both citizens of California for purposes of

25  diversity jurisdiction.  *See* 28 U.S.C. § 1332(a), (c); *see also* Compl. ¶ 1 (Plaintiff is domiciled in

26  California); *id.* ¶ 2 (Maxim's principal place of business is in California).  Consequently, federal

27  question jurisdiction under 28 U.S.C. § 1331 provides the only possible basis for the Court to have

28

Case No. 15-CV-00481-LHK
ORDER SUA SPONTE REMANDING CASE AND DENYING AS MOOT MOTION TO DISMISS

subject matter jurisdiction in this case.

Under 28 U.S.C. § 1331, federal courts have original jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States."  Federal question jurisdiction "must be analyzed on the basis of the pleadings filed at the time of removal" *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213 (9th Cir. 1998).  Removal pursuant to 28 U.S.C. § 1331 is governed by the "well-pleaded complaint rule," which provides that federal question jurisdiction exists only when "a federal question is presented on the face of plaintiff's properly pleaded complaint." *Caterpillar*, 482 U.S. at 392.  In other words, "a case may *not* be removed to federal court on the basis of a federal defense, . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Id.* at 393.

"[I]n certain cases," however, "federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).  Under *Grable*, a federal court may exercise jurisdiction over a state-law claim only if (1) the action necessarily raises a federal issue that is (2) disputed and (3) substantial, and if (4) the court may entertain the case without disturbing the congressionally approved balance of federal and state judicial responsibilities. *Id.* at 314.  The party seeking to establish jurisdiction must justify a need for "the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* at 312.

In its notice of removal, Maxim acknowledges that Plaintiff's complaint "alleges only state law claims."  ECF No. 1 at 2.  Nevertheless, Maxim asserts that Plaintiff's complaint "pleads claims that arise under federal law" for purposes of 28 U.S.C. § 1331. *Id.*  This is so, Maxim says, because "the federal judgment and injunction prohibiting [Plaintiff] from violation [sic] federal securities laws" are "essential to" Plaintiff's claims, even though neither the judgment nor the injunction is mentioned in the complaint. *Id.*  "Additionally," Maxim continues, "the Complaint invokes federal securities laws which are subject exclusively to federal jurisdiction as they have res judicata or federal preclusion effect on some or all of the causes of action in the Complaint."

11

1    *Id.* at 3.

2         The Court is not convinced.  The gravamen of Plaintiff's complaint is a state law breach of

3    contract claim—namely, that Maxim breached the Agreement by refusing to allow Plaintiff to

4    exercise certain vested options and restricted stock units to which Plaintiff says he was entitled.

5    Compl. ¶¶ 9-17.  As the California Supreme Court has stated, "the elements of a cause of action

6    for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse

7    for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis*

8    *W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  Plaintiff alleges (1) that he "entered

9    into" the Agreement with Maxim on February 2, 2007; (2) that he "fully and completely

10   performed all the terms" of the Agreement; (3) that Maxim "breached" the Agreement, which

11   allegedly provided that Plaintiff "would be given the right and opportunity, as was offered to all

12   other Maxim employees, to exercise his options and cash out his vested stock options and vested

13   restricted stock units"; and (4) that Plaintiff "suffered damages" as a proximate result of Maxim's

14   alleged breach.  Compl. ¶¶ 13-17.  "[T]o resolve [Plaintiff's] breach of contract claim," therefore,

15   a court must determine whether Plaintiff has proven these allegations, "applying contract

16   principles under California law."  *Andrews v. Lawrence Livermore Nat'l Sec., LLC*, No. C 11-

17   3930 CW, 2011 WL 3862073, at *3 (N.D. Cal. Aug. 31, 2011).  Maxim has failed to explain how

18   any of the elements for breach of contract, on their face, necessarily raises a substantial issue of

19   federal law.  Maxim has failed equally with respect to Plaintiff's seven other state law causes of

20   action, *see* Compl. ¶¶ 18-54, which the notice of removal mentions only in passing, *see* ECF No. 1

21   at 3.

22        Indeed, the asserted "federal legal issue" that Maxim cites is, at most, a defense or

23   counterclaim to Plaintiff's state law claims, ECF No. 1 at 6, neither of which can confer federal

24   question jurisdiction over this action, *see Caterpillar*, 482 U.S. at 393 (holding that "a case may

25   *not* be removed to federal court on the basis of a federal defense"); *Takeda v. Nw. Nat'l Life Ins.*

26   *Co.*, 765 F.2d 815, 822 (9th Cir. 1985) ("[R]emovability cannot be created by defendant pleading

27   a counter-claim presenting a federal question.").  The federal issue, according to Maxim, is

28
Case No. 15-CV-00481-LHK
ORDER SUA SPONTE REMANDING CASE AND DENYING AS MOOT MOTION TO DISMISS

United States District Court
Northern District of California

"whether [Plaintiff's] present assertion that he was entitled to exercise stock options to which he was, in fact, never entitled or which he forfeited pursuant to the settlement in the Delaware [state court] derivative action triggers the federal injunction" obtained in 2010 in the Northern District of California.  *Id.*  As indicated previously, that injunction prohibited Plaintiff from "violating Section 10(b) of the Securities Exchange Act of 1934" in the following ways:

> (1) employing any device, scheme, or artifice to defraud;
>
> (2) making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
>
> (3) engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of the securities of any issuer, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange.

*Jasper*, 2010 WL 8898216, at *2.

However, whether Plaintiff can prove the elements of his breach of contract claim does not necessarily require a court to determine whether Plaintiff has somehow violated the terms of the federal injunction.  Rather, to resolve Plaintiff's breach of contract claim, a court need only interpret the Agreement under California law; it need not interpret the federal injunction.  *See Andrews*, 2011 WL 3862073, at *3 (remanding case to state court where "to resolve the breach of contract claim, the state court would need only to determine the requirements of the plan and [U.S. Department of Energy] regulations and whether [Lawrence Livermore National Security, LLC] complied with them, applying contract principles under California law").  Indeed, paragraph 4 of the Agreement—i.e., the portion of the Agreement Maxim allegedly breached—neither quotes nor incorporates by reference any federal law.  Similarly, the federal injunction makes no mention of the Agreement.

Maxim's citation to *Los Angeles Police Protective League v. City of Los Angeles*, 314 F. App'x 72, 74 (9th Cir. 2009), an unpublished decision, does not undermine the Court's conclusion.  *See* ECF No. 1 at 2.  To start, that case involved a challenge under the contracts

13

clause of the California Constitution, not a claim for breach of contract.  More importantly, in *Protective League*, unlike here, ruling on the plaintiff's state constitutional contract clause action required the court to "evaluate the [federal] Consent Decree directly."  314 F. App'x at 74.  The court in *Protective League* was also persuaded by the fact that "a federal court has jurisdiction over a facial attack on the Consent Decree."  *Id.*  Here, by contrast, there is no evidence that Plaintiff's well-pleaded complaint presents any such attack on the federal injunction.

The Court finds the Ninth Circuit's published decision in *Berg v. Leason*, 32 F.3d 422 (9th Cir. 1994), to be more instructive.  After summary judgment was granted in favor of the defendant in a federal court action alleging violations of the Securities Exchange Act of 1934, the defendant sued the plaintiff in that action for malicious prosecution in California state court.  *Id.* at 423.  The state court action was then removed to federal court "on the ground that the malicious prosecution claim was based on alleged violations of federal law and therefore 'arises under' the laws of the United States for purposes of federal question jurisdiction."  *Id.*  Reversing the district court, which had declined to remand, the Ninth Circuit held that the "federal element is insufficiently substantial to confer 'arising under' jurisdiction because the malicious prosecution court need only decide whether the underlying claim was 'legally tenable,' the cause of action is created by state law, and state law controls the standard by which the strength of the federal claim in the underlying action is measured."  *Id.*  In so holding, the Ninth Circuit rejected the argument that "because the court will have to analyze the federal securities . . . claims and whether probable cause supported them, pivotal and substantial questions of federal law are necessarily raised."  *Id.* at 424.

The asserted federal hook in this case is even more tenuous.  Unlike the malicious prosecution claim in *Berg*, Plaintiff's breach of contract claim does not contain any element that, on its face, would require a court to evaluate an issue of federal law.  Whether the Agreement existed, whether Plaintiff performed under the Agreement, whether Maxim breached the Agreement, and whether Plaintiff was damaged as a result are all questions of state law, as are Plaintiff's remaining causes of action.  A state court is the proper place to decide them.  *See, e.g.*,

Case No. 15-CV-00481-LHK
ORDER SUA SPONTE REMANDING CASE AND DENYING AS MOOT MOTION TO DISMISS

United States District Court
Northern District of California

*Laird v. Gianulias*, No. 13-CV-01640-WHO, 2013 WL 4851620, at *6 (N.D. Cal. Aug. 12, 2013) (remanding case although "the Reimbursement Agreement does mention the [federal] bankruptcy [proceedings]" because "that context does not embed a federal issue into the breach of contract action"); *see also D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broad., Inc.*, 550 F. Supp. 2d 481, 487 (S.D.N.Y. 2008) (remanding case even though "determining the relief to which [the plaintiff] is entitled will likely require some interpretation and application of the [federal] Communications Act" because, "[a]t its core, this is a state law breach of contract action").

Accordingly, the Court finds that Maxim has not carried its burden to show that Plaintiff's complaint arises under federal law. As there is no original federal jurisdiction under 28 U.S.C. § 1331, removal jurisdiction was improperly exercised and the action must be remanded to state court, 28 U.S.C. § 1447(c). *See Berg*, 32 F.3d at 426.

**B. Motion to Dismiss**

As the Court lacks subject matter jurisdiction over this action, the Court must deny as moot Maxim's motion to dismiss. *See Alderman v. Pitney Bowes Mgmt. Servs.*, 191 F. Supp. 2d 1113, 1116 (N.D. Cal. 2002) (explaining that a "court's decision to remand renders moot [a defendant's] motion to dismiss").

**IV.   CONCLUSION**

For the foregoing reasons, the Court hereby ORDERS that this case be remanded to Santa Clara County Superior Court for lack of subject matter jurisdiction. The Court also DENIES as moot Maxim's motion to dismiss.

**IT IS SO ORDERED.**

Dated: June 2, 2015

_____
LUCY H. KOH
United States District Judge

United States District Court
Northern District of California